and for the appellant, Ms. Redwood, for the appellee, Mr. Fletcher, and Mr. Rubery. Have you split your time between the two of you? Okay. Good morning. May it please the Court? Counsel. Starting off with Parrott v. Taylor, which seems to be a point in a lot of due process cases that causes a lot of confusion. Parrott v. Taylor, the Hobby Kid case, Hudson v. Palmer, the Pillow case, those are cases where an employee of Illinois DOC accidentally, number one, lost a Hobby Kid, and then number two, left a pillow on the stairs, resulting in some damage to an inmate. The Court said that those are random and unauthorized acts. They can't be, they're negligent, and they can't be preceded by any pre-deprivation process because nobody knows it's going to happen. It's just an accident, it's negligent, it's something that happens. So therefore, those plaintiffs were not allowed to come under the due process clause. In this case, the deprivation of the dog, Brody, was not a random and unauthorized act. Number one, the initial deprivation of the dog was pursuant to a search warrant. In fact, Defendant Angelo, the Animal Control Officer, conducted an eight-month investigation of the Defendant Eriguendo for dog fighting, and that is documented in the appendix in her affidavit for the search warrant. So the initial seizure of Brody, while that specific animal was not named in the search warrant, many animals were named in the search warrant. It did not indeed sue Angelo and Maxie for the initial seizure of the dog because it was done pursuant to law in the search warrant. The problem came after that initial deprivation. Angelo and Maxie were informed that this one dog, Brody, was there in doggy daycare, that he belonged to someone else, Mr. Grant, and was provided information to call the next day. And it's in her police report that she was called by Mr. Grant, identifying himself as the owner of Brody. Both of the plaintiffs testified as to their repeated telephone calls to Angelo trying to get their dog back, trying to figure out how they can get their dog back, but ultimately were told that the dog was being held for evidence. So they were misled by Angelo there about any ways they could get their dog back. The story of Angelo is different. She says that she told them to call back and they never called back. That right there, what happened and why these plaintiffs didn't have a pre-deprivation notice is a matter of fact and dispute. And it's highly disputed about what happened on those phone calls between Angelo and between the plaintiffs. Now, the second deprivation was not random and unauthorized because all of it was done pursuant to state statute, and that's the Humane Care for Animals Act. Statutes that give the state actors requirements that they're required to follow. And these comply with due process requirements. Now these are similar to the cases I've cited, Barry v. Barczy, this is where a racehorse was seized because it was drugs in his system. It was initially seized without even knowing if the guy who rides the horse gave him the drugs or not, and that was an okay seizure. But after that, after that initial seizure, he had to have notice and an opportunity for hearing on whether the continued seizure of the horse was proper. The same thing in Walters v. Wolf. He was stopped for traffic. There was a gun in his car. It was seized. He was arrested for it. Turns out that he had a lawful concealed carry permit for it. That was noticed. The gun was demanded and the sheriff refused to return the gun unless there was a court order. The initial seizure was okay. The continued seizure has to comply with federal due process requirements. And in Armstrong v. Manso, the parties divorced, the dad, his whereabouts were known. There was an established state procedure in Texas to let the new stepfather come in and proceed with adoption. All the wife had to do was file a false affidavit or some kind of an affidavit that just barely complied with the original dad. The real dad wasn't notified. And there was the problem. This went all the way through the Texas state court system before it came to the Supreme Court, which said the deprivation had to be preceded by the due process requirements. This goes all the way back to Mullane v. Hanover. So what we're complaining about here against Angelo and Maxie are the 14th Amendment due process violation. The initial seizure, okay. But once that seizure ended, the requirements of due process kick in and indeed they're outlined in the statute. Against the county, we have both a Fourth Amendment because the dog was seized under a warrant. But the warrant requirement is a reasonableness requirement. And it's reasonable to follow the state procedures after the initial seizure. Even in Parrott v. Taylor, the court said a due process claim is properly grounded in allegations of deprivation of due process, not the deprivation of property. So our claim here is not, oh, my dog is dead just by itself. The claim here is, oh, my dog was taken. I was not given the due process that the federal constitution guarantees to me. And that dog was later destroyed, which is a permanent seizure. The violation of state laws actionable under Section 1983, when that violation results in the infringement of a federally protected constitutional right. That's Scrooge v. United States. And that's exactly what happened here. So while Section 1983 does offer protection for the violation of the constitution and federal laws, if the violation of a state statute, such as what happened here, results in a violation of the constitution, the 14th Amendment, that is actionable. This 14th Amendment constitutional violation claim is against all defendants. The Seventh Circuit recognized this in Siebert v. Severino, which is also a case under the Animal Act. Now under qualified immunity, there's a two-step analysis. Was there a constitutional violation? I believe that the facts, as shown, show that there was a constitutional violation. The violation here was a violation of the due process because these plaintiffs weren't given the notice that was required. Under the Humane Care for Animals Act and the criminal code, both Angelo and Maxie were required to, number one, send an affidavit to the court where Mr. Wendell was being charged with the crime. And that's very clear in the statute. And they were also required, Angelo was required, to send a notice or provide a notice to Mr. Grant because she learned that he was a putative owner of this animal. Now the court below had difficulty with the statute and interpreting the statute. However, Ms. Angelo in her deposition clearly testified that she had provided such a notice to Eric Wendell just a month before regarding some other dog that she had seized in the neighborhood that he was a putative owner of. So she knew what this notice was supposed to be. The court had a problem that the court couldn't figure out and all the attorneys couldn't figure out what this notice was supposed to say. But clearly in the Illinois Administrative Code, the notice is something that comes from the Department of Agriculture. The Department of Agriculture is the department that certifies Angelo to be a humane investigator. So all of this is statutory and Angelo testified that she had been this humane investigator for many years. She'd gone through all the courses. She had to go through all the courses in order to be licensed. And the Department of Agriculture provides those notices. So it's not just simply left to an officer on the beat to take out the statute book and read it and try to figure out what the notice is. No, that's left to the humane officer who's licensed by the State of Illinois Department of Agriculture. As to Maxie, a simple affidavit to the court. Which court? The trial court below said. What does court mean? What does complaint mean? It's evident in the statute. The criminal code under dog fighting directly directs the officer to other things that apply to this dog fighting statute. So it's right there under the requirements that an affidavit be provided to the court where the person arrested is being charged. That's the criminal court. Had that affidavit been provided either by Angelo or by Maxie, they would have been off the hook here because then the judge hearing the criminal case would have been able to look in the file and say, ah, here's an affidavit. There's another putative owner. Let's do something about that. Now, but neither one of them provided that affidavit to the criminal court and Angelo didn't provide the notice even though they had information that their argument is, oh, well, we didn't know where he lived. But you can see when you look in Angelo's affidavit for a search warrant, she has all the powers of the police station behind her. She's got all kinds of information in there and the police can find this information out. Their argument that, oh, we didn't know where he lived is really suspicious. They're the police department. They can do all kinds of things that we don't have any idea how they can do. But finding out where somebody lives, yeah, that's pretty easy for them. Well, counsel, isn't one of the aspects of this case, as the trial court indicated and certainly seems to be true, it's a tragic and unfortunate case that something like this would happen. But isn't this an administrative screw-up by somebody at the animal shelter? And it wasn't Angelo or Maxie who either killed this dog or said the dog should be killed? I mean, you know, so essentially maybe they could have and should have done things differently, but they weren't the people who actually killed the dog. Angelo and Maxie did not actually kill the dog. However, they failed to provide notice. They seized the dog. Whatever the notice requirements were, it's the killing of the dog, which is the aspect of this case that you're claiming constituted the violation of civil rights, wasn't it? No, and that's the distinction here. That's the distinction that we get to from Seabrook v. Saperino. It's the Empiric v. Taylor. The due process claim is grounded in the allegations of the deprivation of due process, not the violation of due process. I guess some of the confusion here with the Parrott v. Taylor line of cases, because the deprivation of the property, the destruction of the property, whatever it is, ultimately comes at the end, and that's the injury. But what we're arguing here is that the due process is the actual violation. That's the lack of due process before the dog was killed. Had the dog not been killed, would you have had a claim? If they had got the dog back, we wouldn't. Well, so it's the killing of the dog, which is the issue here. I suspect they were probably as surprised as anyone to discover this dog was killed, weren't they? The killing of the dog is the injury that resulted from the deprivation. Well, as you disconceded, had the dog not been killed and returned to them at some point, there would be no due process claim. Well, they wouldn't have got me to represent them if they got the dog back, but I think they'd still have a due process claim. Well, even if they got you to represent them, they have no claim, do they? They would have a claim to due process if the dog was kept, because any continued deprivation of the property is a claim. If the dog was what? If the dog was kept in the house from December until May when it was actually killed, so that's a six-month. That's a significant deprivation of property without due process. If they had got the process and gone to court and said, hey, this is our dog, come before Judge Kennedy. Well, and even at that point, it wasn't Maxie and Angelo who were custodians of the dog and holding the dog, were they? They weren't holding the dog at the police department, but Angelo did turn the dog over to the county, where she's the animal control officer. So I think there's an argument that she was holding the dog while it wasn't at her house or her apartment at home. It was according to the channels for seizing animals, what she was supposed to do with the animal. So she did what she was supposed to do with the animal, but had she put the dog in the house, provided the notice that she was supposed to provide, either or both, to Mr. Grant and to the criminal court, then someone would have had notice that, hey, something's wrong here. The criminal court, presumably, under the notice requirement under the dog fighting statute, or Mr. Grant, here's your notice, you can come and claim this dog. As it was, under the facts that the plaintiffs testified to, the dog was being held for evidence. That would be, to a normal person, you're holding a dog for evidence, it just has to stay there. If you're holding anything for evidence, it just has to stay there. That's a normal understanding of people that aren't schooled in the law. So that's the information that they had. So the constitutional violation here is the violation of the due process clause, because the property was seized and the due process wasn't given prior to the second deprivation, which is after the warrant. And then the second question is, was the right clearly established here? The right here is the right to due process of law. And under Siebert v. Severino from the 7th Circuit of 2001, that case established that under the Humane Care for Animals Act, animal owners are entitled to due process before deprivation of their animal. So that would be both the continued seizure and then the ultimate destruction of the animal. Now if qualified immunity turns on facts and disputes, summary judgment is inappropriate and those facts have to be decided by the trier of fact. Angelo insists in the paperwork and in her deposition that she was proceeding only under Section 3 of the Humane Care for Animals Act, which does not require this notice that has to be sent. The court also imputed Angelo's mindset to Detective Maxey. Now in the record here, Angelo's claimed that she was proceeding only under Section 3. She disputes it herself and I point specifically to the Affidavit for Search Warrant that's at page 33 of the appendix and of the common law record, page 1070. And this is a six-page affidavit detailing the reasons why she believes that there is dogfighting going on at the Erick Window Residence, the investigation that she did, and everything in that investigation and pursuant to the request for the search warrant comes under dogfighting, the dogfighting statute. That is not Section 3, that's the criminal code, 26-5 at that time which has been renumbered now. But she came under the criminal code. The police reports also dispute Angelo's claims that she came only under Section 3 because the police reports are coming under cruelty to animals, owner's duties, which is Section 3, and dogfighting. And the Erick Window was ultimately arrested for dogfighting. So we have here facts in dispute not only between the plaintiffs and the defendants, but between the defendants' own testimony and records in the record. Because those facts are in dispute, the court below was in error in basing the qualified immunity on Angelo's self-serving testimony that all she was doing was coming under Section 3, which doesn't require this notice. Qualified immunity can't be given under these. Now the defendants continue to point fingers at each other. Okay, I understand that. They can point fingers at each other. To me that means that they're both liable and I believe that they are both liable. But they can't point the fingers at Judge Kennedy. This is like Armstrong versus Manzo. The adoption after a divorce per the state statute and there wasn't any notice to the real dad. Well, here Judge Kennedy is a judge sitting on the bench. He has a lot of matters and what is he ruling on? He's ruling on the pleadings and the papers before him. So while the defendants argue that oh, there was testimony about this other dog, Brody. Yes, there was testimony about Brody, but that testimony didn't say anything about the pleadings being wrong. Brody wasn't listed in there. So he could reasonably have thought that well, Brody's been taken care of some other way. He's been given back whatever. We're talking about six dogs and the six dogs named in this complaint don't include Brody and no one alerted the judge to that fact. And so counsel, given that Brody's not included in the complaint, how is it not just a random act that Brody was euthanized? No one was directed to euthanize this dog, right? Well, it wouldn't be a random act on the part of the judge and we haven't sued the judge. No, I'm talking about someone at animal control where the dog was. This was done pursuant to statute. This being the euthanization? This proceeding. The petition for posting of security, which you're asking about, Judge Holder-White, was done pursuant to statute. And Brody's not named. Brody isn't named. And Judge Kennedy didn't enter any orders as to Brody, right? That's correct. And Stephanie Jews was originally sued, but she was dismissed under immunity early on in the case. And we didn't challenge that because she's the person who wrote the affidavit. She obviously made an error in the affidavit. We didn't proceed against her after Judge Clemens dismissed her out of the case. We'll have additional time to move on. Good morning. May it please the court, counsels. My name is Patrick J. Ruber and I represent the, I guess, the Urbana-Apolese officers, Chelsea Angelo and Duane Maxey. I'd like to point out something. We're not pointing fingers at each other. To the extent that my clients are arguing that they had no personal involvement in this alleged violation, what they're relying on is essentially arguments that Grant and Childers themselves have raised. Essentially that, for example, the state's attorney, according to Grant and Childers, could have instituted a petition for posting of security for Brody, could have sent notice of dependency of the petition for posting of security to Grant, who was clearly identified in police reports along with his telephone number and therefore could have called Grant on the telephone. It's not from my brief. It's from Ms. Redwood's brief. This line of argument that I just made, I think, dovetails with our assertion of qualified immunity. Qualified immunity has two basic elements. One, does the plaintiff even make out a constitutional violation? Two, was the right question clearly established? Now, I don't believe Judge Leonard directly addressed the first point. Indirectly he did, because he addressed causation. And as the courts have repeatedly said, Section 1983 is essentially a tort remedy. And the traditional rules of tort apply, including cause and fact and proximate clause. And Judge Leonard found that with respect to my clients, nothing they did or did not do could be considered either cause and fact or proximate clause. One, they didn't institute the proceedings. I mean, there's a perception out there that police officers, because they file an initial charging guide, that somehow they control the prosecution. We all know that's not the case. And some courts, including the Seventh Circuit, have noted, have not found, but noted that, or maybe wondered aloud would be a better way of putting it, that a malicious prosecution claim against a police officer is an anomaly, because it's the individual who's charged. And once there's a probable cause, the officer can't go in and sell well-off days. The officer can't go in and sell well-off days. He doesn't have that authority. But the thing is that not only did Grant Childress fail to establish that the right was clearly established, they also failed to make out a constitutional violation. My clients did not institute these proceedings. My clients, according to Ms. Redwood, did not file an affidavit in connection with a criminal case. And she makes this great leap. Well, if that affidavit hadn't been filed, we wouldn't be here today. Grant Childress would have stormed the courthouse with an army of lawyers and retrieved Brody. The fact is, and this is undisputed, they knew within a day that their property had been seized. Within a day of the taking. What did they do? I think the word nothing comes to mind. This idea they made a few telephone calls, that's fine. They knew where their dog was. They didn't call a lawyer at that point. There weren't state remedies available. Of course there were. Proplegon, conversion. Alba just filed a pro se petition to intervene. You need a lawyer. Show up at court and say, Judge, they have my dog. It does not require an army of lawyers to do this. But they did. They waited. They did nothing. On the flip side, if Brody had been my dog, it would seem to me to be unconscionable that the dog would be destroyed, absent some cause, such as the other pit bulls that were engaged in fighting. It would be unconscionable, Judge, if they took the dog and said it's a nasty, dangerous pit bull dog and killed it within two days or two hours. We're talking a six month period here. The inactivity is truly remarkable. Are you disputing that they were entitled to some type of notification? I don't think they were entitled. In this instance, I don't believe. Well, in terms of the statute, yes. But does the failure to provide a notification, does that rise the level of constitutional violation? It does not, given the particular circumstances of this case. I'm not saying the state's going to take someone's property if they can do it without giving them any notice. I'm not suggesting that. But here the question is, was there a constitutional violation? And here where they know about it. So bureaucratic fumbling and paper shuffling and telling people, sorry, take your problem down the hall and up two flights. All bad stuff, but it's not constitutionally justiciable. Well, my clients did do the bureaucratic fumbling. I'm representing these two individuals here. In that scenario, could it be? Am I going to say flat out no, there's no way they could ever do that? Well, the phone calls may not be materially significant. Apparently they were made, and it sounds like at least your client, Ms. Angelo, wasn't exactly all that bothered by trying to get this matter resolved. Well, at this point, though, my client doesn't resolve the matter. Basically, again, I'm not pointing fingers here. Well, she's not okay. She doesn't have maybe the keys to the jail, so to speak. But it seems, as Justice Appleton indicated, that had she talked to the people who were, in fact, the keepers of the saw and said, time to let them out. We don't need to keep them anymore. That probably would have done the job, wouldn't it? Well, the problem here is that the prosecutor takes over at some point. And here we're talking about six months. But that doesn't answer my question, counsel. It probably would have done the job if Ms. Angelo had said, let's get this dog out of here. Anyone going to object to that? I don't think my client has the authority to do that. See, that's an interesting observation to a question not asked. How about the question I asked? Well, I guess if you're asking me, Judge, could she have said, we should get this dog out of here?  Well, could she have done that? Yes. But the failure to do that I don't think involves a constitutional violation. So we just have to tsk-tsk over this? We just have to say it's a bad business and maybe the next time she'll do it better? Well, it isn't so much tsk-tsking. The question is, does this amount to a constitutional violation? Did she participate in a constitutional violation? And that's the whole point. There are state law remedies that are available. But they chose Section 1983. They chose the Constitution. They could have brought an action for conversion. They didn't do that. Is kind of the underlying concern here the cost of boarding this dog? And no one was going to pay for that? No one was doing anything to keep these costs from being run up? I can't speak for the state's attorney, but that's what I would gather from what I saw. Does the record show what the costs were of boarding this dog? I believe what they were asking for was in the thousands. For this particular dog, I remember the petition we were talking about. I'd say $10,000 in total. I would simply point out that they didn't make out a constitutional violation here, and they didn't show that the right in question was clearly established. They didn't do that because, A, they didn't show that my clients participated in the violation. And the fact is, it's undisputed that the state's attorney knew about Mr. Grant's possible ownership interest in this animal. He was mentioned at the hearing. Months before the declaration took place, both Mr. Grant and Ms. Childers said they tried to get someone who would help us to get Brody back. Here the point is that this animal was being kept. It's being kept pursuant to a state law. It's being kept pursuant to a valid warrant. The absence of this affidavit, they had to show that this absence of the affidavit somehow violated the Constitution. And I don't think they were able to do that because the initial seizure was legal. It hasn't been questioned. As Judge Leonard pointed out with respect to whether the right was clearly established, there is no real analogous case law out there. Ms. Redwood cited one case in her response to the summary judgment motion, and that is a case called Siebert. Siebert involved a warrantless seizure. I guess he was a volunteer with the Department of Agriculture, and he decided these animals were being mistreated. And on his own, it was decided there were exigent circumstances. And the particular seizure itself had absolutely no provision for relief should the property be wrongfully taken. I ask that you affirm the trial court's award of summary judgment because I believe Judge Leonard correctly found that my clients are entitled to it. Thank you. It was a pleasure. My name is Joel Fletcher, and I represent Champaign County. Let me start with an unpleasant task. There are several admissions I need to make as an officer of the court. Mr. Grant was entitled to notice in this case before his dog was put down. We are not disputing that. The assistant state's attorney in this case did mess up, and we are not disputing that. We are disputing whether the act of that assistant state's attorney is attributable to the county because the assistant state's attorney in sending that notice was acting as a policymaker. This is not a pleasant position for the county to be in, but it's a position where we are in. I would note that Ms. Redwood's clients did have a conversion claim available to them which they did not exercise in a timely manner. They did have remedies available to them that they did not exercise in a timely manner. Given the remedies that they did exercise, the issue here is whether Ms. McGrath was acting as a policymaker for the county. Let me make another unpleasant admission. I don't believe that Perry B. Taylor gets the county out of this position for two reasons. First, because there is a Fourth Amendment violation in addition to a due process violation alleged, and second, because I'm not sure a conversion suit would be an adequate post-deprivation remedy for the loss of an animal. With those admissions out of the way, I would like to focus on what I do believe is the heart of this case from the county's perspective, and that is whether the prosecutor in this case was acting as a final policymaker. There are two ways to look at that. The first is whether or not this act was policymaking, and the second is whether an assistant state attorney generally is acting as a policymaker for the office. I'd like to start with the Humane Care for Animals Act, the notice to be given. The notice is given to interested parties as identified by the court. I note that not to point the finger at the court, but to demonstrate that this is really a ministerial act. The prosecutor in the case is not only not engaging in policymaking, they're not even exercising discretion. They're told by the court who to send notice to. The question raised in the brief I think is a fair one. How is the court to know who to send notice to? For that, I'd point to Section 4.02 of the Humane Care for Animals Act. That provides an affidavit to be provided to the court, indicating not just the person from whom the animal is seized, but also any other person who claims an interest in the property. At that point, under Section 3.05, the court is to conduct a hearing to identify interested parties and inform the petitioner who to notify. Under the Humane Care for Animals Act, it is not necessarily a government petitioner. The Humane Society may well be the petitioner. A private shelter may well be the petitioner. A petitioner may be an entity that has no means of conducting an investigation as to who the proper owners are. Ms. McGrath, in this case, as an accident of history, did have information about who the possible claimants were. But under the Humane Care for Animals Act, your average petitioner is not going to have any means of identifying possible owners. That is why the court is to refer to the affidavit that is placed on file and conduct a hearing to inform the petitioner who to send notice to. It is a non-discretionary ministerial act at that point as to who to send notice to. I suggest to the court that an assistant state attorney generally is just not a policy maker when acting on behalf of the county. Certainly their acts have policy implications. That is reflected in the various cases cited by Ms. Redwood. The First Amendment cases, the patronage cases, indicate that state attorneys have limited employment protections because their actions have policy ramifications. But that line of cases demonstrates that whatever policy making power they have is not final policy making power. That final policy making power rests with the state's attorney and the state's attorney alone. That is reflected in the state constitution. It is reflected in the statutory provision that states that the state's attorney is to have internal control of the internal operations of her office. And most directly, it is reflected in the statutory definition of the office of assistant state's attorney that states that they shall be under the supervision of the state's attorney. There is no way the state's attorney can delegate to an assistant state's attorney final policy making power. That power must reside in the state's attorney alone. I cite Jacobs v. Painter. There are plenty of federal cases cited in the briefs. I understand that this court is not bound by federal law. Unfortunately, there is not a lot of state law to provide guidance on these issues. Jacobs v. Painter is, I submit, the most direct federal case on point cited by the parties. There, a state prosecutor in charge of several felony courtrooms was deemed not to be engaged and not to be a policy maker. And the sole source cited for that proposition was section 4-2003. Not a factual analysis of the case, but a statutory site that says that assistant state's attorneys shall be under the supervision of the state's attorney. I believe the most direct response to that argument that has been provided to date was the statement in an affidavit where Ms. McGrath states that she was the sole attorney responsible for representing Champaign County Animal Control as petitioner. And the suggestion is that by making that statement, she acknowledged that she was the final policy maker. This is an argument that was not presented at the trial court level. It was not an argument that was presented in the motion to reconsider. And I would submit for that reason alone, that argument has been forfeited. I'd also submit that an affidavit is a list of statements of fact, and whether or not Ms. McGrath acted as a final policy maker is not to be determined by her admissions of fact, but based upon the law of the state of Illinois. In Fabiano v. City of Palace Hills, a first district case cited in my brief, the parties attempted to establish final policy maker status by reference to deposition testimony. That was rejected. The court instead looked at the positive law at issue, in that case city ordinances. Here the positive law at issue is the law of the state of Illinois, section 4-2003, which provides that system state's attorneys are acting under the supervision of the state's attorney. The second point I'd make in response to the reliance on the affidavit is that the power to make policy is different from the power to make decisions in individual cases. She may well have the effective power to make decisions in the individual cases. I'd note that any police officer in the state, any armed police officer in the state, has the power to use deadly force. That does not make them a final policy maker. There's a difference between the power to make decisions in an individual case and the power to adopt rules for the conduct of government. That second inquiry is the inquiry that's important for policy making purposes. That statement is reflected in Rasch v. Village of Beecher. It's reflected in Penbower v. Cincinnati, in which the Supreme Court acknowledged that a county decision maker may have discretion to hire or fire, but that does not make them a final policy maker for purposes of an employment decision. That line, the line between individual acts and creating and implementing rules, I believe that is the principle the trial court appropriately drew from Ariema and Rasch v. Village of Beecher. The argument is, in summary, if sending a mail notice constitutes policy making, almost everything is policy making. Any decision by any assistant state's attorney would be policy making, binding on the county under 1983. That would turn Section 1983 into a general liability statute. It would incorporate respondent superior liability into Section 1983. That principle has been repeatedly rejected. I see that I'm almost out of time, but I would be happy to answer any questions the panel has. Thank you for your time. The term policy doesn't necessarily mean a rule, a statute, something the legislature has to make that everybody has to follow. Indeed, as the Supreme Court said, a policy can be made in a single action that was in the Supreme Court versus FAC Concerts Incorporated. The Supreme Court held that municipal liability attached to a single decision to take unlawful action made by a municipal policy maker. So the question is, in this single decision, was Ms. McGrath the policy maker? She testified by affidavit, and her affidavit was submitted to the court below, that she was the sole attorney in charge of this particular action. The cases on states' attorneys go all over the board, especially in the civil context. Is Mr. Fletcher correct, though, that the states' attorney in large counties like Champaign has to act through assistant states' attorneys? They are only carrying out their authority derivatively from the states' attorney. Even if they are ostensibly in charge of this area or that area, this is only until and unless the states' attorneys determine that what they're doing is agreeable to the states' attorney or changes that. These people have no authority themselves, do they? Their authority does come from the states' attorney, that's correct. But in this case, and this is the single action we're talking about, there isn't any evidence that the official states' attorney had anything to do with it. And the cases that I cited in my briefs from Illinois show that the assistant states' attorney can, in some instances, make policy and that they exercise the rights. I went to the county's code and the assistant states' attorneys do exercise the rights of the states' attorney. Well, they're exercising the powers and duties, they have to. The assistant states' attorney shows up and represents the people of trial or the plea agreement or whatever the case might be. How does that equate to their setting policies? Isn't that a matter that still resides within the states' attorney position itself? I don't think that it does in this action. And remember, when we're talking about a states' attorney, we're talking about the entire gamut of things that they do, which is vast. And so what we're talking about here is this single action which was delegated to this particular states' attorney and there isn't any overseeing shown, there isn't anything shown that she had a checklist from the states' attorney that she had to follow. She indeed had the sole authority to prosecute this collection action, which is really what it was, collection money for the county against the individual. So I believe that under the cases I've cited that the states' attorney can, the assistant states' attorney can be a policymaker for this one individual action. And I agree, the main issue here against the county is whether she was a policymaker. I think the cases say that she can be seen as a policymaker. If she isn't a policymaker, we have a much harder, we have much harder, but that's what it was, that's what the case turns on, whether she was or was not a policymaker. So if this court agrees with the court that she wasn't a policymaker, I think we're lost and perhaps it could have been pled or argued different below on responding to the actual states' attorney, that of course was not argued below. In regards to Mr. Rubery's argument about proximate cause and causation, I did cite Payne v. Berglund, that actual causation exists where an injury would not have occurred but for a defendant's conduct. That's a certain defendant. And also, tort principles don't say that one defendant's actions have to be the proximate cause, but a proximate cause. And under tort principles, the actions of different defendants can combine together a proximate cause here, a proximate cause there, and a proximate cause here. So it's not mutually exclusive as far as tort principles. Thank you. I'll take this matter under advisement and stand in recess until the readiness of the next case.